W.W. Findley, defendant, purchased an oil well in Caddo Parish, which had ceased to produce. He desired to test it for production and through his agent, O.O. Gilbert, effected an agreement with Isom J. Langley, husband of the plaintiff, whereby Langley obligated himself for the consideration of $1,000 to clean out the well and set four inch liner at a depth of 2,430 feet, unless work was stopped by Gilbert at a lesser depth. It was thought that the well could again be made to produce at a depth of not more than 2,430 feet. Langley was obligated to furnish all material, machinery and labor necessary to discharge his part of the contract. When the well had been cleaned to the depth of 2,394 feet or thereabout, a strata of gumbo was encountered which could not be penetrated with the bit then being used. To attach an efficient bit required the withdrawal from the well of the long string of tubing or drill stem. Gilbert and Langley discussed the situation and it was decided by Gilbert to then make a test for production, with the understanding that if unsuccessful, Langley would continue to clean the well to the agreed depth of 2,430 feet. The liner was set on Sunday, August 2, 1942. Langley then withdrew his machinery and labor and Gilbert, acting for Findley, brought his to the scene to swab and bail the well. As an accommodation to Gilbert, Langley allowed him to use the string of tubing he had in the well at that time; otherwise Gilbert would have had to use his own tubing in the process of swabbing.
Gilbert began to swab the well on Monday, August 3rd, and continued thereat until about noon Wednesday, at which time, becoming dissatisfied with results, he decided to bail, which means the removal of water and mud. This is a well-recognized method of testing for oil and gas. His bailer was smaller than one owned by Langley and, at Langley's suggestion, his was substituted and used. Bailing was done Wednesday afternoon and to early afternoon of Thursday when the bailer stuck at the bottom of the well. All efforts by Findley's men and machinery *Page 909 
to extricate it failed. Gilbert then asked Langley to attach his machinery and give him a "pull", which was done. However, the bailer remained stuck. The cable attached to it was left taut for the night in the hope that the steady "pull" would disengage it from its fastening, but Friday morning brought no change in the situation. The double efforts of Thursday were resumed and continued until the cable broke. Gilbert then moved defendant's labor and machinery to the site of another well to "pull" it. Langley and his men soon captured the broken line which had fallen down into the well. On being advised of this, Gilbert with men and machinery, returned to the scene and both machines were again employed in the resumed effort to pull the bailer out. The line again broke and again Gilbert with machinery and men went away to "pull" another well, leaving Langley, his men and equipment engaged in trying the extricate the bailer. This continued to about noon of August 8th, when the derrick over the well, on account of excessive strain upon it, collapsed and fell upon Langley, killing him instantly.
Plaintiff, on the theory that when killed the relation of employer and employee existed between her husband and the defendant, Findley, and that he was killed in the course and while performing the duties of his employment, sues to recover workmen's compensation at the rate of $20 per week for three hundred weeks, and funeral expenses. In the alternative, she sues to recover damages as in case of tort. This phase of her suit is based upon the theory that one of the supporting legs of the derrick was weak to the degree that it was dangerous to use it, a fact she avers was unknown to the deceased.
Defendant carried workmen's compensation insurance with the Associated Indemnity Company. This company was also impleaded as a defendant.
Defendants deny that the deceased's relation to Findley, when killed, was that of employee, and deny that he met death through any fault or negligence on the part of Findley or his agents. They aver that the deceased was killed as a result of his own carelessness and negligence "in attaching his pulling line to the derrick in such a way as to pull it to one side, and in not observing the signs of overstrain on the derrick which must have been apparent before it was pulled down." In the alternative, the negligence of the deceased in the instances mentioned, is pleaded in bar of recovery in the tort action.
The demands of plaintiff were firstly rejected, but on rehearing, judgment, supported by written reasons, awarding her compensation at the rate of $11.70 per week for three hundred weeks, plus expenses of funeral, was rendered. Defendants appealed. Answering the appeal, plaintiff prays that the rate of compensation be increased to $20 per week and in the alternative that judgment in the tort action be rendered in her favor as by her prayed.
These facts are admitted by both sides:
That under the contract with Findley, the deceased's status was that of independent contractor; that it was Findley's obligation to disengage the bailer and continue the efforts at testing; that if the test was unsuccessful the deceased was obligated to re-enter the well and clean it to the depth of 2,430 feet; that there was no express contract between Gilbert and the deceased which obligated the latter to continue efforts, especially on Saturday, the day he was killed, to disengage the bailer.
It is plaintiff's contention that from the time Langley, at Gilbert's suggestion or request, attached his machinery to the line to assist in pulling the bailer, took on a new status from that which characterized him under the original contract, such status being that of employee. Her counsel admits there was no express contract of employment nor discussion of or agreement about any remuneration for the assistance deceased was rendering after the bailer stuck; but they say the relation of employer and employee, tacitly, at least, arose from the facts and circumstances and point to the fact that work of the character deceased was doing while trying to disengage the bailer was well worth $40 per day.
Evidently all concerned thought the bailer could be quickly disengaged by the pulling power of both machines and, if this had happened, Langley's connection with the operation would have immediately ended. Naturally, since their opinion on this score proved unfounded, Langley continued to render assistance. He had a three-fold personal interest in seeing the bailer disengaged as quickly as possible. First, it was his bailer; second, completion of bailing would prove if the well would or would *Page 910 
not be a producer. If a producer, he was entitled without further work on his part to be paid the $1,000 consideration of the contract; if not a producer, he only had to go back in the well and clean it for an additional 36 or 37 feet to complete his contract; and third, so long as the well's status as to production was undetermined, he and his equipment were not free to seek employment or work elsewhere.
From the time Langley hooked on his machinery, at Gilbert's request, and until Gilbert abandoned work on Friday, when the line broke the second time, they acted in concert and counseled together in the effort to extricate the bailer. Both had had long experience in such matters. Gilbert was not present continuously and when absent Langley exclusively directed operations.
Even though it be granted (a fact about which we are not certain) that during Thursday and Friday it could be said that the relation of Langley and Findley was tacitly that of employer and employee, we are certain that status did not characterize Langley on Saturday, the day of his death. Gilbert did not return to the well at all on Saturday. He did not when he left the scene on the evening before, nor thereafter, request Langley to get the bailer out; neither did Langley agree or promise to continue his efforts to do so. It is probably true that Gilbert assumed that Langley, on account of his personal interest, would resume his efforts to disengage the bailer, but this assumption, followed by Langley's action, we think, did not amount to or create the relation of master and servant.
It is our opinion that a situation different from that which previously existed, was created and prevailed on Saturday to the time of Langley's death. He and his workmen returned to the well Saturday morning. His machinery was there all the time. On his own initiative he adopted a course of procedure to disengage the bailer not previously resorted to. This was his own idea. The plan involved the use of more lines through a traveling block, which added greatly to the pulling power of the machinery. The derrick collapsed while the new plan was being tried.
Surely Langley's status on Saturday was one of complete independence from the supervision or control of anyone. If it be said that a tacit or quasi contract arose from the facts it can safely be further said that Langley's status thereunder was identical to that which characterized him in fulfilling the original written contract. He chose to assume a responsibility that did not devolve upon him and elected to act in a manner all his own. He simply volunteered to perform a task he was free to let alone.
Notwithstanding that the uniform attitude of the courts is to enlarge rather than restrict the operative effect of the Workmen's Compensation Law, Act No. 20 of 1914, as amended, we are of the opinion that the facts of this case, not even by a strained interpretation, bring it within the purview of that beneficent piece of legislation.
There is no Louisiana case whose facts are even nearly similar to those of the instant case. Hatten v. Haynes et al., 142 So. 286, decided by this court, is the nearest approach, but it is not at all in point. Plaintiff's energetic counsel have cited cases from other jurisdictions which they urge, in the absence of any here, should be persuasive if not controlling. However, the facts of none of these cases are on all-fours with those of the case at bar. We are, therefore, forced to "pioneer" on the issue tendered by the exceptional facts of the case.
The facts of the case destroy the alternative demand, that for damages in tort.
The deceased was entirely capable by many years' experience of performing any work or task arising from the drilling and operation of oil wells. Naturally, he was well qualified to appraise the strength and efficiency of any kind of derrick. He had been working or waiting about the derrick involved for over one week and had used it while cleaning the well. Therefore, he must have observed the derrick in all of its aspects and should have known and is held to have known the extent of its ability to withstand strains.
The derrick was not of the strength of one used in drilling an oil well. It was designed for use in pulling pipe, tubing, etc. It was erected over the well by an expert in derrick construction. It had been protected from injurious corrosion by paint. Everyone who saw it and who testified in the case was of the opinion that the derrick was in good condition. The fact that it withstood the strain put upon it for nearly two days by the pulling of the two machines is convincing evidence of its *Page 911 
strength and good condition. There was a limit to its capacity to stand against strain. It was not built to resist every sort of test. Deceased evidently knew this.
The west legs of the derrick "kinked" from the excessive strain resulting from the machine's pulling of the multiple steel lines running from the traveling block, near the derrick's top, to the large steel cable leading into the well.
We are clear in the opinion that Langley met death because of his own carelessness and negligence in putting too much strain upon the derrick.
For the reasons herein assigned, the judgment of the lower court, in so far as it rejects plaintiff's tort action, is affirmed; and for said reasons the judgment appealed from, awarding her compensation, is annulled, avoided and reversed; her suit is dismissed at her cost.